# **<u>Exhibit 1</u>**

A true and accurate copy of the 2014 Indictment



Case 3:14-cr-00240-JLS   Document 1   Filed 01/08/14   PageID.2   Page 1 of 11

**FILED**

JAN 0 8 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

UNSEALED 1/9/14

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HASSAN RAFIEE (1),<br>MAJID NOURI (2),<br>IDIN RAFIEE (3)<br><br>Defendants. | Magistrate Docket No. 14MJ0057<br><br>COMPLAINT FOR VIOLATION OF:<br><br>Title 50, U.S.C., Secs. 1702 and 1705, and<br>Title 31, C.F.R., Part 560 – Conspiracy to<br>Export to Embargoed Country |

The undersigned complainant, being duly sworn, states:

## COUNT ONE

Beginning on a date unknown and continuing through on or about October 7, 2013, within the Southern District of California, and elsewhere, defendants HASSAN RAFIEE, MAJID NOURI, and IDIN RAFIEE, United States persons, did knowingly and willfully conspire and agree with each other, and with other persons known and unknown, to:

a.      sell and supply, directly and indirectly, air conditioning equipment to Iran without having first obtained the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of Treasury, in violation of Title 31, Code of Federal Regulations, Section 560.204;

b.      engage in transactions in and related to air conditioning equipment for export, reexport, sale and supply, directly and indirectly to Iran without having first obtained the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of Treasury, in violation of Title 31, Code of Federal Regulations, Section 560.206; and

c.      approve, finance, facilitate, and guarantee a transaction by a foreign person where the transaction by that foreign person would be prohibited by this

//
//
//

1 es

part if performed by a United States person or within the United States;

all in violation of Title 50, United States Code, Sections 1702 and 1705.

      And the complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

                                        Kevin M. Hamako, Special Agent
                                        Homeland Security Investigations

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE,

THIS ⸻ DAY OF January, 2014.

                                        Hon. Barbara L. Major
                                        United States Magistrate Judge

CONTINUATION OF COMPLAINT RE:
HASSAN RAFIEE et al.

## STATEMENT OF FACTS

1.      I am a Special Agent with United States Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since August 2010. I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia, where I was trained in various types of criminal investigations including narcotics investigations, financial investigations and counter proliferation investigations. As an HSI Special Agent, I am currently assigned to conduct investigations involving the illegal exportation of technology from the United States. I have participated in numerous such criminal investigations. Because this statement of facts is prepared for the limited purpose of supporting a criminal complaint and obtaining arrest warrants, it does not contain all facts known to me concerning the investigation. When referring to e-mail messages, the messages are quoted or summarized only in part.

### A.      The Iran Trade Embargo

2.      The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.

3.      On March 15, 1995, the President issued Executive Order 12957, finding that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declaring "a national emergency to deal with that threat." Executive Order 12957, as expanded and continued by Executive Orders 12959 and 13059, was in effect at all times relevant to this Complaint.

4.      Executive Orders 12959 and 13059 (collectively, with Executive Order No. 12957, the "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States.

5.      Pursuant to the Executive Order, the United States Secretary of the Treasury promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders. Section 560.204

prohibits the unauthorized exportation, reexportation, sale, or supply, directly or indirectly, from the United States of any goods, technology, or services to Iran or the Government of Iran. Section 560.206, among other things, prohibits U.S. persons, wherever located, from engaging in any transaction or dealing in or related to goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran. Section 560.208 prohibits approving, financing, facilitating and guaranteeing any transaction by a foreign person where the transaction by that foreign person would be prohibited if performed by a United States person, as is prohibited by Section 560.206.

6.  The Department of Treasury's Office of Foreign Assets Control ("OFAC") administers the authorization and issuance of licenses for any exports subject to the Iranian Transactions Regulations. In the absence of a license, or other prior approval, it is illegal under IEEPA and the Iranian Transactions Regulations to export products or services to Iran without a license, or to export the products or services to a third country if the export is intended or destined for Iran.

## B.  Background on HASSAN RAFIEE, MAJID NOURI, AND IDIN RAFIEE

7.  HSI has been investigating Hassan RAFIEE ("HASSAN"), Idin RAFIEE ("IDIN"), also known as Dean RAFIEE, and Majid NOURI ("MAJID") for their involvement in businesses based in the U.S. and elsewhere which are conspiring to supply and export air conditioning equipment to customers in Iran without the required licenses from the Office of Foreign Assets Control, U.S. Department of Treasury.

8.  HASSAN, MAJID, and IDIN are U.S. citizens originally from Iran. Pasha International, also known as Surnyx, is a company based in San Diego, California, founded in 2011. Pasha Tak is the name that Pasha International and Surnyx use for their business located in Iran. Surnyx corporate literature describes IDIN as the founder and director of sales, MAJID as the chief executive officer, and HASSAN as the chief financial officer.

9.  HASSAN, MAJID, and IDIN, along with other persons, acting through Surnyx, have conspired for a number of years to profit from their ties to Iran by knowingly evading U.S. sanctions in order to negotiate deals with non-U.S. companies for the procurement of a variety of goods to be shipped unlawfully to Iran. In total, HASSAN, MAJID, and IDIN, have negotiated deals to send goods to Iran, which are valued at more than $8 million.

//
//

## C.   Yonchi Deal

10.   Following the inception of this investigation, court authorized search warrants were obtained for several email accounts.  A review of those email search warrant results revealed many of the details of HASSAN, MAJID, and IDIN's unlawful procurement scheme.  For instance, the contents of four of HASSAN and IDIN's email accounts revealed the details of a deal with a company called Wuhan Yonchi, based in Wuhan, China.  Beginning in late 2011, HASSAN and IDIN conducted a deal with Wuhan Yonchi for the purchase of approximately $57,705 worth of vacuum pumps.[1]  While IDIN began the deal, HASSAN became more actively involved when payment became an issue.

11.   On October 17, 2011, the presumed owner of Yonchi, emailed HASSAN.  IDIN replied and asked to speak with him on the telephone.  After they spoke, on October 21, 2011, IDIN sent Yonchi's owner an email in which he acknowledged the sanctions and stated:

> As we both know, there are a lot of sanctions on Iran right now, and many companies are not willing to import their products to Iran.  So my father and i came up with an idea to see if we can use the address of the office that you have in Hong-Kong in our business cards and website. so [sic] we can get better ideas about surrounding market and future opportunities.

12.   A few months later, on January 17, 2012, Yonchi's owner emailed IDIN, copying HASSAN, to tell him that the vacuum pumps that IDIN and HASSAN had ordered were delayed, and that the shipment would be delayed.  On February 6, 2012, HASSAN emailed Yonchi's owner to ask him if Yonchi had an account with Kunlun Bank.  He advised Yonchi to open an account with Kunlun and inquire about letters of credit.

13.   Yonchi's owner replied to HASSAN, suggesting that they use other banks that would also accept an Iranian letter of credit.  HASSAN replied asking for a pro forma invoice that included the name of the bank Yonchi used, and asked that Yonchi send him invoices priced in yuan and Euros.  He also stated that Kunlun Bank was the one bank that Iranian banks were currently accepting, but that he would try to open up a letter of credit.

---

[1]   Based on open source research, I understand that vacuum pumps are used in several different industries, including air conditioning systems, the production of electric lamps and even semiconductor processing.  Specifically for air conditioning systems, I understand that vacuum pumps can be used to remove contaminants from air conditioning systems.

14.     Yonchi's owner complied with HASSAN's request, and sent him the two invoices.  The invoices were addressed to "Hassan Rafiee Khameneh"[2] at an address in Tehran, and stated that the loading port was in China and the port of destination was the Bandar Abbas port in Iran.  In his accompanying email, Yonchi's owner told HASSAN that the date of the shipment would depend on whether HASSAN paid via a letter of credit or a wire transfer.  The approximate value of the purchase was $57,705.

15.     The next day, HASSAN replied and added to the order.  He also stated that they were going to try to do a line of credit, and if they were unsuccessful, they may not go ahead with the purchase at this time.  He cautioned that a wire transfer would take some time, and acknowledged that the problems they were having were attributed to the sanctions.  Yonchi's owner replied the same day to tell HASSAN that Kunlun Bank was the only bank that they could use, and that it appeared that their best option was to do a wire transfer.

16.     In January 2013, HASSAN emailed Yonchi's owner asking him to email a test report for each item on the invoice.  He also added, "The container is in Bander Abbas Port and that standard office is asking for these reports and I hope that after mounths [sic] we can clear the goods..."  Yonchi's owner later responded to HASSAN, copying IDIN, with test reports for several items.  Based on the exchange, I believe the vacuum pumps were purchased and shipped to Iran as discussed, but (as of January 2013), were still at the port and awaiting clearance from Iranian customs.

### D.     Ali-Shan deal

17.     In late 2011, IDIN also rekindled a relationship that Pasha had with an auto parts company named Ali-Shan.  For the next year, the Rafiees and MAJID negotiated a deal for approximately $107,100 worth of air conditioning compressors.  The items were scheduled to be shipped to Iran in December 2012.  As described below, a review of four of HASSAN, MAJID, and IDIN's email accounts revealed several emails evidencing this deal.

18.     IDIN's initial email to Ali-Shan on December 8, 2011 stated, "My name is Idin Rafiee, Mr. Hassan Rafiee is my father.  I have recently started working with him.  Sorry that we have not been keeping in contact.  Past few months we have had many changes too [sic] our company.  We are now Pasha International."  IDIN also requested a price quote for several items.

---

[2]     Based on a review of his alien registration file, this is the name that Hassan Rafiee used when he entered the United States. He maintained the name until he became a naturalized U.S. citizen.

55

2:17-cv-10249-PDB-RSW   Doc # 1-2   Filed 01/25/17   Pg 8 of 12   Pg ID 62

19.    An Ali-Shan employee replied to IDIN's email and on December 10, 2011, IDIN replied stating, "After reviewing our results from doing market research, we saw that Pasha has a very good potential to distribute this product in Iranian market, due to customer demand and most importantly our good connections in this market..." IDIN also said he would send more specifics on what products Pasha wanted. On December 12, 2011, IDIN followed up with an order for compressors. In the email, he insisted that the items would have to be priced at $40 each for Pasha to be competitive in the Iranian market.

20.    The next month, in January 2012, IDIN emailed Ali-Shan to say that HASSAN and MAJID, who he described as a partner, would be in Shanghai on January 15th for a visit to Ali-Shan's offices. A search of government databases revealed that both HASSAN and MAJID both flew to Asia on January 11, 2012. HASSAN returned to the United States in February 2012, and MAJID returned in March 2012.

21.    As with the Yonchi deal, extensive discussion of how payment was to be made occurred between Ali-Shan and Pasha. On February 1, 2012, Ali-Shan's sales department emailed IDIN to tell him that they could not accept a letter of credit from Iran. On February 8, 2012, IDIN emailed an Ali-Shan employee to tell her to use "Pasha Tak" for the orders to Iran. On the same day, HASSAN emailed IDIN, saying, "Please ask them [sic] change the name of PFI [pro forma invoice] to Paksoma Co.[3] and ask them we will open L/C. The name of the bank we can open L/C is (Kunlun Bank) and they should write the bank name and bank A/C information on PFI." The following day, IDIN communicated HASSAN's message to Ali-Shan.

22.    On March 5, 2012, an Ali-Shan employee emailed IDIN to reiterate that Ali-Shan could not use a letter of credit from Iran. IDIN replied with a longer email containing details of what Ali-Shan would have to do to use an Iranian letter of credit via Kunlun Bank. He also noted that Pasha used the process with other suppliers, including Sanyo, Midea, and Ningbo.

23.    A week later, IDIN forwarded an email to another individual working with Pasha and copied HASSAN and MAJID. The email included an invoice from Ali-Shan for approximately $107,100 worth of air conditioning compressors described above. The invoice also stated that the items were to be shipped via "freight from Shanghai to Bandar Abbas."

24.    On May 7, 2012, IDIN emailed an Ali-Shan employee and stated that they had opened the letter of credit and needed to have the items. However, on

---

[3]    Based on open source research, I understand that Paksoma/Pakshoma is a major appliance company in Iran. It appears that the HASSAN, MAJID, and IDIN distributed to Paksoma/Pakshoma the items purchased from the Asian suppliers.

May 20, 2012, an Ali-Shan employee emailed to say that Ali-Shan had learned that
Iran had been cut off by the SWIFT financial service[4], and thus the deal could not
proceed.

     25.    On June 6, 2012, MAJID forwarded HASSAN an email from IDIN to
Ali-Shan in which IDIN expressed his frustration with the delay in the deal,
saying:

> For TT [telegraphic transfer] to be processed, the government of Iran
> needs an inspection company to inspect the product before being send
> to IRAN...We want Ali-Shan to understand that our team in iran [sic]
> has spent a lot of time and money to work on this project.

     26.    Nonetheless, the negotiation, handled by IDIN and MAJID on behalf
of Pasha, regarding how the items would be paid for and who would pay for the
items to be inspected, continued into July 2012. Finally, on July 22, 2012, another
Pasha employee emailed informed Ali-Shan via email that Pasha had transferred
the payment and to request that shipping arrangements be made. On August 2nd,
Ali-Shan confirmed payment. Throughout August, September, and October, Pasha
waited for Ali-Shan to provide inspection certificates and a firm shipment date, as
well as confirm that the compressors could be inspected by an inspection company.
Pasha informed Ali-Shan that the inspection was an Iranian customs requirement.
While most of the negotiation was handled by another Pasha employee, MAJID
and IDIN were typically copied on the emails. MAJID would also often forward
the emails to HASSAN.

     27.    Finally, on December 6, 2012, Ali-Shan sent a copy of its proposed
invoice and packing list for the items to another Pasha employee. The Pasha
employee replied with a suggestion, and copied HASSAN and IDIN. That same
day, Ali-Shan sent a final invoice and bill of lading which was addressed to
Pakshoma Company. IDIN was listed as the contact for Pakshoma and the invoice
indicated that it had been paid via a wire transfer. The bill of lading indicated that
the items were to be shipped from Shanghai to Bandar Abbas, Iran.

### E.    Kulthorn Deals

     28.    In addition to working with MAJID through Pasha International and
Surnyx, the Rafiees partnered with and supported MAJID in other deals. As
described below, a review of the evidence found in two of HASSAN and MAJID's

---

[4]    Based on open source research, SWIFT is the Society for Worldwide Interbank Financial
Telecommunication network that is used to send financial information worldwide. On March 17,
2012, SWIFT discontinued services to Iranian financial institutions following the European
Union's sanctions announcement.

email accounts revealed several emails evidencing these deals.  Specifically,
MAJID negotiated a distribution agreement with Kulthorn Kirby Public Co., a Thai
based motor compressor[5] manufacturer with whom MAJID had a longstanding
relationship.  The distribution deal led to a great deal of business for the Rafiees,
MAJID, and several others with whom they worked.  As discussed below, between
late 2011 and 2013, HASSAN and MAJID engaged in approximately $8 million
dollars in deals for the purchase of hermetic compressors shipped to Iran.

29.    MAJID is listed on Kulthorn's website as its distributor in Iran,
associated with an entity called SARMA GOSTAR DORNA CO. LTD.[6]
Additionally, emails found in HASSAN's email account reveal that on November
5, 2011, MAJID forwarded an email chain he had received from an individual at
Kulthorn.  The earliest email, dated June 27, 2011, stated: "Please find and review
our best quotation for KA and LA [Kulthorn compressors] as attached.  Prices are
C&F[7] Bandar Abbas..."

30.    Later that month, on November 28, 2011, MAJID forwarded to
HASSAN another string of November 2011 emails between Kulthorn
representatives and MAJID.  In one of the emails, dated November 18, 2011,
Kulthorn expressed its concern with MAJID's sales history, saying:

...Reference is made to the above subject, while appreciating your
cooperation and support on a long-time relationship, you could clearly
see the attached sales record from 2002-2011.  This record does not
definitely satisfy to [sic] both of us, Sarma Group and especially
KKC.  Our top management Mr Suraporn really wants to capture
more market share in Iran and has been very concerned...

31.    MAJID replied to the November 18, 2011 email, stating:

As I have mention [sic] in our meeting in June 2011 in KK factory
these numbers that you have [sic] Attached are very misleading &
wrong I do not understand how you pick them...we have forecasted
for 2011-2012 for 55252 units of compressors that is another increase
in such bad Economics [sic] situation in Iran & rest of world.  We

---

[5]     Based on an open source search, I understand that motor compressors have a variety of
uses in several industries, including refrigeration, oil refineries, and some jet engines.  With
respect to refrigeration and air conditioning, compressors facilitate the movement of heat.
[6]     On Manta.com, an online small business directory, MAJID is listed as the principal of
"Dorna Inc," an entity based out of his home in Katy, Texas.
[7]     Based on an open source search, I understand that C&F is a reference to cargo and freight
and means that the seller pays for the cost of the goods and freight charges up until the
destination port.

> have lost one our major clients that we used to supply them AW since
> they are buying from one of KK Agent in the world but however we
> are pressing for bigger market in Iran because as you mention in your
> E-mail this is a common benefit to us both...

Emails found in HASSAN's email account reflect that MAJID began placing orders again in December 2011.

32.    In reviewing MAJID's and HASSAN's email accounts, agents also found summaries of larger scale deals conducted by MAJID and HASSAN. Specifically, on or about February 26, 2013, a person working with HASSAN and MAJID forwarded an email from Kulthorn to HASSAN. The Kulthorn email, originally sent to MAJID and others, included a payment summary which detailed € 2,628,895.20[8] in deals from December 2011 until early 2013. Additionally, on or about June 3, 2013, a person working with HASSAN and MAJID again forwarded an email from Kulthorn to HASSAN. The Kulthorn email, which again had originally been sent to MAJID and others, included a payment summary which detailed € 2,645,360.60[9] in deals in 2013.

33.    In addition to finding spreadsheets, agents also found in HASSAN's email approximately nineteen invoices of deals, some of which were included in the spreadsheets described above, from Kulthorn to Pakshoma in Tehran, Iran an entity linked to the Rafiees and MAJID through the Yonchi and Ali-Shan deals discussed above. The invoices totaled approximately € 3,433,146.16.[10]

34.    Additionally, in late 2012, smaller deals were conducted with Kulthorn in which IDIN was also involved. Specifically, for example, on or about March 9, 2012, MAJID forwarded an email from Kulthorn to HASSAN and IDIN, which contained two invoices for $812,800 worth of hermetic compressors to be sent to Iran. On April 11, 2012, MAJID wrote an email to Kulthorn representatives, which HASSAN later forwarded to IDIN, explaining "we would need your help regarding the problem we have with USgovernment [sic] sanction that Iran is facing we only can send money through L/C [letter of credit] or TT [telegraphic transfer] through China, India, Turkey & Russia that means the performa s [sic] has to be issue from these countries."

---

[8]    Based on an open source search of the exchange rate on February 26, 2013, this amount is equivalent to $3,430,905.47.
[9]    Based on an open source search of the exchange rate on June 3, 2013, this amount is equivalent to $3,457,750.84.
[10]   Based on an open source search of the exchange rate on October 7, 2013, this amount is equivalent to $4,658,768.28.

35.   The emails also revealed that HASSAN and MAJID traveled to Thailand on January 11, 2012 to participate in Kulthorn's 30th anniversary festivities at their invitation.   As discussed above in paragraph 20, government database checks corroborate the travel.

36.   In December 2013, I received a license history from the Department of Treasury, Office of Foreign Assets Control, indicating that there were no applications for, or OFAC licenses issued to HASSAN, MAJID, IDIN, Pasha International, Pasha Tak, Sumyx, or Pakshoma during the relevant time period described herein.