UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TECUMSEH PRODUCTS
COMPANY,

          Plaintiff,

v.

KULTHORN KIRBY PUBLIC
COMPANY LTD. and ELCO
REFRIGERATION SOLUTIONS,
LLC,

          Defendants.

_____/

Case No. 17-10249

Paul D. Borman
United States District Judge

R. Steven Whalen
United States Magistrate Judge

## OPINION AND ORDER:
### 1) DENYING DEFENDANTS' MOTION TO STRIKE, WITHOUT PREJUDICE;
### 2) DENYING DEFENDANTS' MOTION TO DISMISS IN PART; AND
### 3) GRANTING DEFENDANTS' MOTION TO DISMISS IN PART

Plaintiff Tecumseh Products Company ("**Plaintiff**" or "**Tecumseh**") brings this action against Defendant Kulthorn Kirby Public Company Ltd. ("**KKC**") and Defendant Elco Refrigeration Solutions, LLC ("**Elco**") for various trademark-related claims. Plaintiff and KKC are manufacturers of compressors, condensers, and other refrigeration and air-conditioning-related parts. Elco is KKC's exclusive distributor in the United States. The claims in this action include state and federal trademark and unfair competition claims, as well as one claim under the Michigan Consumer Protection Act ("**MCPA**"), Mich. Comp. Laws § 445.903(1)(a).

Plaintiff owns three registered trademarks (the "**subject marks**") that are the focus of this lawsuit: the prefixes "AE," "AW," and "AE2," used in conjunction with compressor and/or refrigeration parts of the sort that Plaintiff and KKC produce for sale. Defendants have moved to dismiss the action, arguing that their usage of the subject marks does not constitute infringement, and that Plaintiff's MCPA claim is insufficient as a matter of law. Defendants have also moved to strike several allegations in the Complaint. For the reasons below, the Court will grant in part and deny in part Defendants' Motion to Dismiss. The Court will also deny Defendants' Motion to Strike, but will wholly disregard the allegations challenged in that Motion until such time as their relevance is clearly demonstrated.

## I. BACKGROUND

### A. Factual Allegations

#### 1. The parties

Plaintiff is a manufacturer of hermetically sealed compressors for residential and commercial air conditioners, refrigerators, and freezers. It also "offers a complete line of indoor and outdoor condensing units, evaporator coils, heat pumps, complete refrigeration systems and authorized spare parts." Plaintiff sells its products to "Original Equipment Manufacturers, Service Technicians and Exporters." (ECF No. 1, Compl. ¶ 29.)

Defendant KKC is a Thai company publicly traded on the stock exchange of Thailand, and it is a manufacturer and seller of compressor products and condensing units for use in refrigeration products. (Compl. ¶ 47; ECF No. 12-1, Defs.' Mot. at 2-3.) KKC states in its Motion that it also "has a variety of holdings, including steel companies, metal product companies, magnet wire companies, and a foundry." (Defs.' Mot. at 3.) Defendant Elco, a California limited liability company with its principal place of business in California, identifies itself as the exclusive distributor of KKC's products in the United States. (Compl. ¶ 10; Defs.' Mot. at 3.) Plaintiff alleges that KKC is "well familiar" with Plaintiff and its products, in part because "KKC was a party to several manufacturing, sales and lease agreements with [Plaintiff] during the 1980s." Those agreements "expired long ago." (Compl. ¶¶ 48-49.)

### 2. Idin Rafiee and PashaCo

Plaintiff alleges on information and belief that non-party Idin "Dean" Rafiee, a California resident, owns and controls Elco, and that Mr. Rafiee is a "key . . . driver of [Elco's] KKC compressor sales in the United States." (Compl. ¶¶ 12-15.) Mr. Rafiee is also the founder of a company called Pasha International Corp. ("**PashaCo**"), which Plaintiff alleges on information and belief is "effectively a continuation of Elco." (Compl. ¶¶ 18, 22.)

Mr. Rafiee and PashaCo were among the defendants in a federal criminal

3

proceeding in the United States District Court for the Southern District of California between 2014 and 2016, and Plaintiff has attached a January 8, 2014 criminal complaint against Mr. Rafiee as an Exhibit. (Compl. Ex. 1, 2014 Complaint.) Plaintiff accurately describes the criminal complaint as alleging that Mr. Rafiee "operated PashaCo to carry out a conspiracy to evade trade sanctions against Iran by unlawfully procuring more than $8 million in goods – primarily cooling equipment – for customers in Iran." (Compl. ¶ 19.) Plaintiff further alleges that, per the criminal complaint, Mr. Rafiee's "relationship with KKC dates back many years and, between late 2011 and 2013, landed [Mr. Rafiee] and others approximately $8 million dollars in deals for the purchase of hermetic compressors shipped to Iran." (Compl. ¶ 20.) It is significant that the criminal complaint against Mr. Rafiee was subsequently dismissed.

Attached to the Complaint is a Judgment in a Criminal Case and an Order of Criminal Forfeiture from the same proceeding, reflecting that only PashaCo pled guilty to a charge of Conspiracy to Export to Embargoed Country, forfeited $874,940.61 in criminal proceeds to the government in connection with that plea, and was sentenced to a three-year probationary term. (Compl. ¶ 21; Compl. Ex. 2, Criminal Judgment and Forfeiture Order.)

On the basis of these allegations and Exhibits, as well as its own information and belief, Plaintiff alleges that "Elco (as the successor to PashaCo) and [Mr.

Rafiee] are no strangers to activity involving KKC, and KKC compressors, reaching a criminal level of disregard for the laws of the United States." (Compl. ¶ 76.)

### 3. The trademarks at issue

There are three subject marks at issue in this case. Each is a two-letter prefix (and in one case a prefix with two letters and one number) that designates a series of compressor models manufactured and sold by Plaintiff: the "AE Mark," the "AW Mark," and the "AE2 Mark."

The AE Mark corresponds to Plaintiff's "AE" series of compressors, first released on the market in 1960. The AE series originally consisted of seven basic models, but now Plaintiff offers over 100 models in the series. (Compl. ¶ 31.) On November 1, 2016, a U.S. trademark was granted to Plaintiff for "AE," with "[e]lectric compressors, compressors for commercial refrigeration and air conditioning applications" as the specified goods and services connected with the trademark. (Compl. ¶ 41; Compl. Ex. 3, AE Registration.)

The AW Mark corresponds to Plaintiff's "AW" series of compressors, first released on the market in 1986. The AW series originally consisted of 22 basic models, but now Plaintiff offers over 35 models in the series. (Compl. ¶ 32.) On November 1, 2016, a U.S. trademark was granted to Plaintiff for "AW," with "[e]lectric compressors, compressors for commercial refrigeration and air

conditioning applications" as the specified goods and services connected with the trademark. (Compl. ¶ 42; Compl. Ex. 4, AW Registration.)

The AE2 Mark corresponds to Plaintiff's "AE2" series of compressors, first released on the market in 2011. The AE2 series originally consisted of 10 basic models, but now Plaintiff offers over 100 models in the series. (Compl. ¶ 33.) On November 1, 2016, a U.S. trademark was granted to Plaintiff for "AE2," with "[e]lectric compressors, compressors for commercial refrigeration and air conditioning applications" as the specified goods and services connected with the trademark. (Compl. ¶ 43; Compl. Ex. 5, AE2 Registration.)

Plaintiff has used these marks both on labels and in advertising throughout the world. (Compl. ¶ 35.) The Complaint includes five exemplary images of Plaintiff's use of the marks. (Compl. at 14-18.) Plaintiff alleges that each of the three marks has created a "strong source identifying significance in the minds of United States consumers," and that they are widely recognized and highly distinctive trademarks owing to their use by Plaintiff in association with compressors. (Compl. ¶¶ 37-40.) Plaintiff alleges that the compressor series connected with the three marks have been highly successful, and that Plaintiff has made millions of dollars' worth of sales between them. (Compl. ¶¶ 45-46.)

### 4. Alleged acts of infringement

Plaintiff alleges that in the first half of 2016, KKC and Elco began "using

the marks AE and AW in association with compressors sold to, and advertising directed at, consumers throughout the world, including in the United States . . . ." (Compl. ¶¶ 51-52.) The Complaint includes screen-capture images from each Defendant's website showing the use of the subject marks: four images from KKC's website (Compl. at 24-27), and six images from Elco's website (Compl. at 28-33).

Plaintiff also alleges that Defendants' use of the subject marks is not limited to the Internet, and includes in the Complaint what appears to be a print advertisement for a KKC compressor that uses the AE mark. (Compl. ¶ 57; Compl. at 34.) The advertisement features a KKC logo at the top, an Elco logo at the bottom (next to company contact information), a picture of a compressor visibly bearing a label with the KKC logo on it, and the following text comprising roughly a quarter of the advertisement:

> Winter 2016 Compressor Special
> The Famous AE 4440Y-1
> ONLY $85.00

(Compl. at 34.) "AE 4440Y-1" and "$85,00" are printed in red, while the remainder of the text is printed in black. (*See id.*) An image of this advertisement is attached to this Opinion and Order as Appendix A.

Plaintiff also alleges that KKC's use of the subject marks extends to online retailers like Amazon.com, and that it is even reproduced by third parties in

7

secondhand markets such as the auction website eBay. (Compl. ¶¶ 58-59.) As an example, the Complaint includes an image of an eBay listing in which the seller uses the AE mark to refer to a KKC product, and then compares the KKC product to an analogous Tecumseh product (also using the AE mark). (Compl. at 36.)

Finally, the Complaint includes images of product literature from Plaintiff and both Defendants, each of which lays out product specifications for a particular compressor model or models, and each of which contains the AE mark. (Compl. at 37-38.) Of this, Plaintiff asserts that "KKC and Elco are so dedicated to promoting consumer confusion that they slavishly mimicked Tecumseh's compressor model nomenclature in creating KKC's compressor model nomenclature—all in an unabashed effort to free ride off the goodwill and consumer recognition of Tecumseh's AE Trademark, AE2 Trademark and AW Trademark." (Compl. ¶ 60.) These images are attached to this Opinion and Order as Appendix B.

Plaintiff alleges on information and belief that Defendants have targeted wholesalers and manufacturers with whom Plaintiff does business, and promoted what Defendants call "Tecumseh" products. This (along with the other alleged acts of infringement) has led to substantial consumer confusion; in fact, Plaintiff alleges that consumers have contacted Plaintiff in attempts to order products actually marketed by Defendants. (Compl. ¶¶ 61-62.)

On March 10, 2016, Plaintiff sent a letter to KKC demanding that KKC

cease the use of the mark "AE 444OY-1" in connection with the sale of compressors, and that KKC provide written confirmation to Plaintiff within ten days of its plans with respect to future use of the mark. (Compl. Ex. 6, March 10 Letter.) KKC responded to the letter on March 17, 2016, stating that it took Plaintiff's allegations seriously and would look into the matter, but that it "may take some time to gather the information necessary to provide a more detailed response." (Compl. Ex. 7, March 17 Letter.)

Plaintiff filed applications for the registration of the subject marks on March 25, 2016. *See* AE, Registration No. 5,072,832 (filed Mar. 25, 2016); AW, Registration No. 5,072,835 (filed Mar. 25, 2016); AE2, Registration No. 5,072,834 (filed Mar. 25, 2016).

Plaintiff sent another letter to KKC on May 11, 2016, stating that Plaintiff had not received a more detailed response as promised by KKC, and stating that Plaintiff would refer the matter to legal counsel for the appropriate legal action if KKC did not provide it within 14 days. (Compl. Ex. 8, May 11 Letter.) Plaintiff claims that although KKC's legal counsel represented that it would provide a substantive response by June 10, 2016, no such response was provided. Plaintiff alleges on information and belief that Defendants continue to use the subject marks in a way that infringes Plaintiff's trademark rights. (Compl. ¶¶ 67-68.)

As noted above, Plaintiff was officially issued a trademark for each of the

three subject marks on November 1, 2016.

## B.   Procedural History

Plaintiff filed this action on January 25, 2017. (ECF No. 1, Compl.) The Complaint asserts five claims: trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 (Count I); unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count II); common-law trademark infringement (Count III); common-law unfair competition (Count IV); and violation of the MCPA (Count V).

Defendants filed the present Consolidated Motion to Dismiss and to Strike Complaint on March 22, 2017. (ECF No. 12.) After the Court granted Plaintiff a one-week extension of time to respond (ECF No. 18), Plaintiff filed a Response on April 19, 2017 (ECF No. 20). Defendants filed their Reply on May 2, 2017. (ECF No. 21.) The Court held a hearing on Defendants' Motion on June 16, 2017.

## II.     LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012).

To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted).

In other words, a plaintiff must provide more than "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The United States Court of Appeals for the Sixth Circuit has recently reiterated that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A court ruling on a Rule 12(b)(6) motion "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are

referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

Finally, Rule 12(f) provides that "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "An allegation is 'impertinent' or 'immaterial' when it is not relevant to the issues involved in the action. 'Scandalous' generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that 'detracts from the dignity of the court.'" *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 801 (E.D. Mich. 2015) (Borman, J.) (quoting *L and L Gold Assoc., Inc. v. American Cash for Gold, LLC*, No. 09–10801, 2009 WL 1658108, at *1 (E.D. Mich. June 10, 2009)). As a general rule, "[m]otions to strike are viewed with disfavor and are not frequently granted." *Operating Engineers Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015).

## III.    ANALYSIS

### A.    The Court will exclude Defendants' Exhibits in ruling on their Motion to Dismiss.

Defendants have attached eight Exhibits to their Motion: six putative contracts between Plaintiff and KKC from between 1979 and 1991 (Defs.' Mot. Exs. A-F), and two photographs of labels on KKC parts that include the subject

marks (Defs.' Mot. Exs. G-H). None of these Exhibits is attached to the Complaint, and none of them meets the exception for documents that are "referred to in the Complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430.

Exhibits A through F attached to Defendants' Motion are a series of agreements between Plaintiff and KKC, beginning with their initial 1979 license agreement, and continuing through a series of amendments to that agreement until 1991. Defendants include these Exhibits to support an argument that for years before Plaintiff registered the subject marks, it regarded them as descriptive model designations rather than trademarks. Arguably, the 1979 agreement and its amendments are referred to in the Complaint, since Plaintiff alleges that "KKC is well familiar with Tecumseh and Tecumseh's products. Indeed, KKC was a party to several manufacturing, sales and lease agreements with Tecumseh during the 1980s." (Compl. ¶ 48.) But importantly, the 1979 agreement is "not central to *plaintiff's* claim. If anything, it seems central to the defense. It is precisely the sort of document on which defendant could properly rely in a motion for summary judgment, along with appropriate authentication supporting its admission." *Miller v. Mylan Inc.*, 741 F.3d 674, 679 (6th Cir. 2014) (Gibbons, J., concurring).

The same holds true for the amendments to the 1979 agreement that are attached to Defendants' Motion as Exhibits B through F, and for Exhibits G and H,

which are high-resolution photos of KKC part labels. Defendants maintain that "Plaintiff only provides low resolution images that do not adequately inform the Court of how, exactly, the products in question appear in commerce," and justify the inclusion of Exhibits G and H by stating that the images "are central to the claims within Plaintiff's Complaint because, if Defendants do not display the part numbers in question in a manner that indicates the origin or source of their goods or services, then Defendants have not made a trademark use of the part numbers." Here again, this is central to a potential defense rather than to Plaintiff's claims. Moreover, there is plainly no argument to be made that the two photos are referenced in the Complaint.

The Court will therefore exclude all eight exhibits attached to Defendants' Motion to Dismiss, and they will not be considered in the Court's analysis.

**B.      The Court will not consider the Complaint's allegations regarding Idin Rafiee and PashaCo at this juncture.**

In the Motion to Strike that is consolidated with their Motion to Dismiss, Defendants move to strike the allegations in the Complaint regarding Idin Rafiee and PashaCo: specifically, the allegations in paragraphs 16 through 22, and in paragraph 76. Those allegations concern criminal proceedings against Mr. Rafiee (alleged to be owner and controller of Elco) and PashaCo (alleged to be the predecessor to Elco).

Defendants argue that these allegations are irrelevant because neither Rafiee nor PashaCo are parties to this action; that they are prejudicial because they are inflammatory, particularly in Mr. Rafiee's case, given that the criminal charge filed against him was dismissed; and that overall they are "blatantly intended to trade off of the anti-Iranian sentiment that is perceived to be present in American society." (Defs.' Mot. at 24.) In response, Plaintiff reminds the Court that a motion to strike is an "extreme measure" (Pl.'s Resp. at 29), and argues that the allegations are relevant because they pertain to the damage done to Plaintiff's reputation by Defendants' acts of infringement, and because they bear on issues of credibility and good faith.

That neither Mr. Rafiee nor PashaCo is named as a party to this action seriously undermines any relevance of the allegations. However, as the Court noted at the hearing on Defendants' Motion, it is not inconceivable that those allegations could become relevant under certain limited circumstances at a later stage of this litigation. Thus, although the Court will not consider these allegations at this time, it would be premature to strike them altogether. Accordingly, the Court will deny Defendants' Motion to Strike, without prejudice.

**C.** **The Court will deny Defendants' Motion to Dismiss as to Counts I through IV of the Complaint because Defendants have not demonstrated that they engaged only in non-trademark use of the subject marks, or that they are entitled to assert the "fair use" defense.**

"Trademark" is defined by federal law as a "word, name, symbol, or device, or any combination thereof" that a person uses, or registers with intent to use, in order "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

To state a federal trademark infringement claim, "a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). The third of these factors—likelihood of confusion—is the most important. See *id.* at 610 ("The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.") (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)).

In determining whether a likelihood of confusion exists,

> a court will typically weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in

selecting the mark; and (8) likelihood of expansion of the product lines. But the likelihood of confusion analysis also involves a preliminary question: whether the defendants are using the challenged mark in a way that identifies the source of their goods. If they are not, then the mark is being used in a "'non-trademark' way" and trademark infringement laws, along with the eight-factor analysis, do not even apply.

*Hensley*, 579 F.3d at 610 (internal citations and quotation marks omitted).[1]

Defendants offer two arguments for dismissal of Plaintiff's claims in Counts I through IV: (1) that they have used the subject marks only in a "non-trademark way," and (2) that in any case federal trademark law's "fair-use defense" bars Plaintiff's recovery. These arguments share an essential premise: that Defendants used the subject marks descriptively as product numbers, and not as trademarks or in some other way that was designed to engender confusion about product origin. "Non-trademark use" arguments and "fair use" defenses are evaluated under different standards, however, so each is considered separately below. For the reasons that follow, the Court will reject both of these arguments, and therefore

---

[1] These standards have been used by courts in this District and in the Sixth Circuit to evaluate not only federal trademark infringement claims, but also federal false designation claims, common-law trademark infringement claims, and common-law unfair competition claims. *See, e.g., Kassa v. Detroit Metro Convention & Visitors Bureau*, 150 F. Supp. 3d 831, 841 (E.D. Mich. 2015) (holding that the plaintiff's "false designation of origin, common law trademark infringement, and [Michigan common-law] unfair competition [claims] are analyzed under the same standard as [his] federal trademark infringement claim") (collecting cases), *aff'd*, 672 F. App'x 575 (6th Cir. 2017). Accordingly, the Court's analysis of Plaintiff's claim in Count I of the Complaint will apply to the claims in Counts II, III, and IV as well.

deny Defendants' Motion to Dismiss as to Counts I through IV.

**1.     Defendants have not shown that they engaged only in "non-trademark use" of the subject marks as a matter of law.**

As noted above, Sixth Circuit precedent establishes that a district court need not engage in the eight-factor "likelihood of confusion" analysis if the plaintiff has failed to plead or prove that "the defendants are using the challenged mark in a way that identifies the source of their goods." *Hensley*, 579 F.3d at 610. In *Hensley*, for example, the Sixth Circuit found that the defendant's use in an advertisement of the name of an inventor who had formerly worked for the Plaintiff met this standard because the use did not "suggest any current association" between the inventor and the plaintiff, and because it was otherwise clear that the product being sold was not produced by the plaintiff. *Id.* at 610-11. More recently, another court in this District found that the defendants' use of the trademarked phrase "Welcome to the D" on banners promoting sporting events was a non-trademark use because the defendants "did not use the phrase . . . to identify the source of any goods or services nor did their use of [it] in any way imply any connection between [the plaintiff] and the events identified on the banners and signs." *Kassa v. Detroit Metro Convention & Visitors Bureau*, 150 F. Supp. 3d 831, 838 (E.D. Mich. 2015) (further noting the significance of the fact that in context, the phrase was merely a descriptive reference to the city of Detroit,

and the fact that the banners identified entities other than plaintiff as the sponsors of the events), *aff'd*, 672 F. App'x 575 (6th Cir. 2017). The threshold question, then, is whether "the defendants are using the challenged mark in a way that identifies the source of their goods." *Hensley*, 579 F.3d at 610.

Defendants argue that their use of the subject marks is descriptive rather than source-identifying. In this regard, Defendants appear to take the position that using a mark descriptively—*i.e.*, to identify a product as belonging to a particular model designation, as Defendants claim they did—is *per se* a non-trademark use. But an "either/or" distinction between descriptive use and trademark use is not supported in the governing law, and Defendants themselves cite authority indicating as much when they note that descriptive marks such as product numbers can be protectable as trademarks, but only "when they have acquired secondary meaning in the minds of the public."[2] (Defs.' Mot. at 15 (citing *J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir. 1985)).) In other words, it is true that if "a defendant does not use a mark to 'identif[y] the source' of its goods or services, then as a matter of law a plaintiff cannot establish a likelihood of confusion" and therefore cannot prevail on a trademark infringement claim.

---

[2] The parties seem to agree that descriptive marks like product numbers and model designations must acquire "secondary meaning" beyond their descriptive character in order to merit trademark protection. Whether Plaintiff's use of the subject marks over the years caused them to acquire secondary meaning is not an issue that the parties argue to any substantial degree. The Complaint alleges that it did (Compl. ¶¶ 37-39), in any case, so the Court assumes that to be true for present purposes.

*Kassa*, 150 F.Supp. 3d at 838 (alterations in original). But it does not follow from this or from any other authority cited by the parties that a defendant cannot use a mark both in a descriptive sense *and* to "identify the source" of its goods and services.

It is clear that Defendants have used the subject marks in a descriptive sense as model designations. Defendants make two arguments in support of this conclusion: that the agreements between the parties show that both Plaintiff and KKC historically viewed the subject marks this way; and that the same can be seen in the "Compressor Model Nomenclature" diagrams of the different parties, each of which lays out the various model designations within particular product series. (*See* Compl. at 37-38.) The first of these arguments would require the Court to consider the Exhibits to Defendant's Motion, and since this cannot be done without converting the present Motion to a summary judgment motion, the Court rejects this argument. But the second argument is persuasive in itself: the diagrams on pages 37 and 38 of the Complaint clearly demonstrate that the "AE" mark has descriptive value as a model designation, and it can be inferred that the same is true of the other subject marks as well.

At the same time, though, Plaintiff has alleged that Defendants used the subject marks in a way that "identifie[d] the source of their goods," and that allegation is plausible. The allegation is supported by the images of Defendants'

advertisements included in the Complaint, in which the subject marks are featured prominently, but it is supported even more by the advertisement (which has the logos of both Defendants) on page 34 of the Complaint. That advertisement conspicuously features the AE mark in the phrase "The Famous AE 444OY-1." (Compl. at 34.) The parties dispute what "famous" means in context—whether it refers to the fame of Plaintiff's product in the U.S. market, or to fame that Defendants' product had garnered in international sales (since it had only recently entered the U.S. market)—but whichever interpretation is correct, the advertisement is playing on the existing market notoriety of either Plaintiff's product or Defendant's product by invoking the AE mark in the way that it does. This is enough to make plausible Plaintiff's allegation that Defendants used the subject marks in a source-identifying way.

Accordingly, it would be premature to hold as a matter of law that Defendants used the subject marks only in a "non-trademark" way. Even though Defendants' use of the subject marks as model designations was descriptive to some degree, it is plausible that Defendants also used them in a trademark way. To the extent that Defendants assert that their use was descriptive in order to show that it was *de facto* a non-trademark use, then, the Court rejects this argument.

## 2. Defendants have not shown that they are entitled to the "fair use" defense.

The fair-use defense is a statutory defense expressly set forth in the Lanham Act. 15 U.S.C. § 1115(b)(4) relevantly provides a defense to trademark infringement claims for defendants who can show that "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."

A two-pronged test applies here: "[i]n evaluating a defendant's fair use defense, a court must consider whether [the] defendant has used the mark: (1) in its descriptive sense; and (2) in good faith." *Hensley*, 579 F.3d at 612 (quoting *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 920 (6th Cir. 2003)). (The other requirement in § 1115(b)(4)—that the mark be used only to describe the defendant's own products—is presumably implicit.) The Sixth Circuit has explained that

> [u]nder the doctrine of "fair use," the holder of a trademark cannot prevent others from using the word that forms the trademark in its primary or descriptive sense. The only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, "trademark" meaning of the word that plaintiff has created. The original, descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition.

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 319 (6th Cir. 2001) (internal quotation marks omitted) (quoting McCarthy on Trademarks &

Unfair Competition § 11:45 (4th ed. 1996)).

For the reasons discussed in the previous subsection, Defendants' use of the subject marks as model designations was descriptive, and this meets the first prong of the fair-use standard. Defendants' argument that the "good faith" prong is satisfied, however, depends almost entirely on the agreements that Defendants attached as Exhibits to their Motion. In fact, Defendants' counsel acknowledged on the record at oral argument that the Exhibits are central to the fair-use defense. But the Court may only consider them without converting the present Motion to a summary judgment motion if they are central to *Plaintiff's claims*, and because they are not, the Court rejects them as viable evidence at this stage.

Considering only the allegations in the Complaint, the Court finds that Defendants' fair-use defense cannot succeed at this phase. There is nothing on the face of the Complaint to support a finding that Defendants used the subject marks in good faith. Moreover, the allegation that Defendants "have targeted Tecumseh authorized wholesalers and current [Original Equipment Manufacturer] customers promoting what [Defendants] call the Tecumseh AE or AW compressor" (Compl. ¶ 61)—an allegation which the Court assumes to be true for present purposes— weighs against a determination that Defendants used the subject marks in good faith. Plainly, Defendants have not met their burden on the fair-use defense.

Since Defendants have not shown that they engaged only in non-trademark

use of the subject marks or that they are entitled to invoke the fair-use defense at this stage, the Court will deny their Motion to Dismiss as to Counts I through IV.

**D.      The Court will grant Defendants' Motion to Dismiss as to Count V because Defendants' products are not used primarily for personal, family, or household purposes.**

Count V of the Complaint asserts that Defendants violated the MCPA, which prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[c]ausing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services." Mich. Comp. Laws § 445.903(1)(a). Defendants contend that this claim should be dismissed because its products are not used primarily for personal, family, or household purposes, as contemplated by the MCPA. Plaintiff has not addressed this argument—or its MCPA claim generally— in any substantial way in its Response or at the hearing on the present Motion.[3]

In any event, Defendants are correct on this point. The MCPA defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes." Mich. Comp. Laws §

---

[3] Even putting aside the merits of Defendants' argument, the Court regards the MCPA claim as abandoned for this reason. *See Beydoun v. Countrywide Home Loans, Inc.*, No. 09-10445, 2009 WL 1803198, at *3 (E.D. Mich. June 23, 2009) (dismissing an MCPA claim on a finding that plaintiff's failure to address defendants' arguments for dismissal "constitute[d] waiver or abandonment of the argument") (quotation marks omitted) (collecting cases).

445.902(1)(G). Case law interpreting this provision has gone a step further: the Sixth Circuit noted that "[t]he Michigan Supreme Court has held that the [MCPA], while applying to consumer purchases, 'does not apply to purchases that are primarily for business purposes.'" *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 661 (6th Cir. 2013) (quoting *Slobin v. Henry Ford Health Care*, 469 Mich. 211, 666 N.W.2d 632, 634 (2003) (per curiam)); *see also Zine v. Chrysler Corp.*, 236 Mich. App. 261, 273–75 (1999) (holding that a truck was outside the scope of the MCPA because the individual buyer used it more for business purposes than personal reasons). Here, Plaintiff's allegations make clear that its products are "sold to Original Equipment Manufacturers, Service Technicians and Exporters" (Compl. ¶ 29)—not, significantly, to individuals, families, or households.

Accordingly, the Court will grant Defendants' Motion to Dismiss as to Count V of the Complaint.

## IV.    CONCLUSION

For the reasons set forth above, the Court hereby:

- DENIES Defendants' Motion to Strike without prejudice;

- DENIES Defendants' Motion to Dismiss as to Counts I, II, III, and IV; and

- GRANTS Defendants' Motion to Dismiss as to Count V.

This leaves the following of Plaintiff's claims going forward: trademark infringement under 15 U.S.C. § 1114 (Count I); unfair competition and false designation of origin or sponsorship under 15 U.S.C. § 1125(a) (Count II); common-law trademark infringement (Count III); and common-law unfair competition (Count IV).

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated: **JUL 1 0 2017**



(Compl. at 34.)



# Tecumseh

## COMPRESSOR MODEL NOMENCLATURE

| (AE² models only) | AE | 4 | 440 | Y | ● | AA | 1A |
|---|---|---|---|---|---|---|---|
| **All models except (AE²)** | **AEA** | **4** | **440** | **Y** | | **XA** | |

| | Compressor Family (First Two Digits) Release Variant (The Third Digit) | Application | First Digit is the No. of Digits in Btu/h Capacity Last Two Digits are the First Two Digits in Rated Btu/h Capacity | Refrigerant | Voltage | Release Variant (AE² models only) |
|---|---|---|---|---|---|---|

Examples:
AE² model number:
**AE4440Y-AA1A**

Model number except AE²:
**AEA4440YXA**

| Compressor Family | Application |
|---|---|
| **AE** | **A** = 1st |
| **AG** | **B** = 2nd |
| **AH** | **C** = 3rd |
| **AJ** | etc... |
| **AK** | |
| **AV** | |
| **AW** | |
| **AZ** | |
| **RG** | |
| **RK** | |
| **TP** | |
| **TH** | |
| **VS** | |

In this example (4) total digits, with the first two (40), or 4,000 BTU capacity

### Primary Application Parameters

| Evap Temperature | Rating Point | Motor Starting Torque |
|---|---|---|
| 1. Low | -10°F | Normal |
| 2. Low | -10°F | High |
| 3. High | +45°F | Normal |
| 4. High | +45°F | High |
| 5. Air Cond | +45°F | Normal |
| 6. Medium | +20°F | Normal |
| 7. Medium | +20°F | High |
| 8. Air Cond | +49°F | Normal |
| 9. Commercial | +20°F | High |
| 0. Commercial | +20°F | Normal |
| F. Low – Vapor Inj | -10°F | High |
| G. Low – Liquid Inj | -10°F | High |

NOTE: For explanation of compressor families and codes, contact Tecumseh Products Company.

### Primary Refrigerants

| |
|---|
| **A** = R12 |
| **B** = R410A |
| **C** = R407C |
| **E** = R22 |
| **X** = (CBP Models Only) R404A/R507, R134a, R22 R407A, R407F |
| **Y** = R134a |
| **Z** = R404A/R507 |

### The first digit is the Motor Type; the next digit is the Motor Efficiency

| |
|---|
| 1 = Induction Run (RSIR/ CSIR) |
| 2 = Optional Run Cap |
| 3 = Capacitor Start/Run (CSR) |
| A = Standard Efficiency |
| B = Medium Efficiency |
| C = High Efficiency |

### Voltage Codes

| |
|---|
| **AA** = 115/60/1 |
| **AB** = 115/60/1; 90/50/1 |
| **NA** = 208-230/60/1 |
| **VA** = 265/60/1; 220-240/50/1 |
| **XA** = 115/60/1; 100/50/1 |
| **XB** = 230/60/1; 200/50/1 |
| **XD** = 208-230/60/1; 200/50/1 |
| **XG** = 460/60/3; 380-420/50/3 |
| **XH** = 575/60/3; 480-520/50/3 |
| **XN** = 208-230/60/1; 200-220/50/1 |
| **XT** = 200-230/50/3; 200-220/50/3 |
| **XV** = 265/60/1 |

### Compressor Replacement Guides and Quick Selects

This document is not to be used as a drop-in replacement guide. The cross-reference is offered to use as a tool to help identify potential replacement options based on performance fit. Mounting and tubing connections are likely to differ from original installation. With use, system performance parameters will most likely have changed from initial specifications. Careful review of current application requirements is essential. **IT IS THE RESPONSIBILITY OF THE SERVICE PERSON TO ASSURE THEY HAVE PURCHASED A REPLACEMENT PRODUCT WHICH MEETS THE NEED OF THE APPLICATION.** Failure to do so may result in misapplication requiring immediate or subsequent additional component replacement.

2

(Compl. at 37.)



Technical Bulletin                                        November 2007

## Model Number System
A model number can provide basic information about a compressor

1. **Single Phase Compressors – except C-B and C-Q**



(Compl. at 38.)

29




Family Release Variant : A = 1 st., B = 2 nd., etc.

- Abbreviated Nominal Rated BTU Capacity at 60Hz.
- In this example (4) total digits, with the first two (14) indicating 1,400 BTU/Hr. capacity.

Electricity Supply Code

AZ A 3 4  14 Y - 1

| None | - 220 - 240V/50Hz | | 3PHASE |
|---|---|---|---|
| -1 | - 115V/60Hz | -9 | = 380-420V/50Hz , 460V/60Hz |
| -2 | - 208-230V/60Hz | -XG | = 380-420V/50Hz , 440-460V/60Hz |
| -3 | - 100V/50-60Hz | -XT | = 200-220V/50Hz , 200-230V/60Hz |
| -4 | - 110V/60Hz | -XI | = 380V/60Hz |
| -5 | - 127V/60Hz | -XK | = 480V/60Hz |
| -6 | 220-240V/50Hz , 208-230V/60Hz | | |
| -7 | - 127V/50-60Hz | | |
| -8 | - 110-115V/60Hz | | |

Refrigerant

| A,V | - R12 | G | - R22/R407C |
|---|---|---|---|
| E | - R22 | M | - R600a |
| Y | - R134a | N | - R290 |
| Z | - R404A/R507 | B | - R410A |

Application

1 = Low Back Pressure. Motor With Normal Starting Torque.
2 = Low Back Pressure. Motor With High Starting Torque.
3 = High Back Pressure. Motor With Normal Starting Torque.
4 = High Back Pressure. Motor With High Starting Torque.
5 = Air Conditioning. Motor With Normal Starting Torque.
6 = Medium Back Pressure. Motor With Normal Starting Torque.
7 = Medium Back Pressure. Motor With High Starting Torque.
8 = Air Conditioning (High eff.) Motor with Normal Starting Torque.
9 = Commercial Back Pressure. Motor with High Starting Torque.
0 = Commercial Back Pressure. Motor with Normal Starting Torque.

Compressor Family : AZ-AZA-AE-BA-CA-WJ-AW-KA-LA



**Exclusive Master Distributor of Kulthorn Products**
2554 Commercial Street, San Diego, CA 92113 / Ph. +1-619-255-5251 / www.elcors.com

6

(*Id.*)